## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| WILLIAM HIX,<br><br>        Plaintiff,<br><br>vs.<br><br>ACRISURE HOLDINGS, INC.,<br><br>        Defendant, | Civil Action File<br>No.:  1:21-cv-04541-MLB |

## DEFENDANT ACRISURE HOLDINGS, INC.'S ANSWER AND COUNTERCLAIMS

Defendant Acrisure Holdings, Inc. ("Defendant" or "Acrisure Holdings"), by and through its undersigned attorneys hereby answers the complaint (the "Complaint") of William Hix ("Plaintiff' or "Hix") and alleges counterclaims as follows:

### ANSWER

The allegations contained in the preamble of the Complaint are not directed at Defendant and require no response.  To the extent a response is required, Defendant admits that Plaintiff has owned shares in Acrisure Holdings.  Defendant further admits that it sent a letter to Plaintiff on or about March 21, 2021 regarding Defendant's right to exercise its Call Option for such shares and retain the proceeds

to offset debt owed by Plaintiff to Defendant.  Defendant denies all other allegations contained in the preamble.

## The Parties

1.      Defendant admits the allegation in Paragraph 1 that Plaintiff has been a resident of Georgia.  Defendant lacks knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 1 and therefore denies same.

2.      Defendant admits the allegation in Paragraph 2 that it is a Delaware corporation and may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Defendant further admits that Acrisure, LLC is a related entity and that it is registered to do business in Georgia.   Defendant denies the remaining allegations contained in Paragraph 2.

## Jurisdiction and Venue

3.      Paragraph 3 contains conclusions of law to which no response is required.  To the extent a response is required, Defendant admits that Plaintiff asserts the Court has subject matter jurisdiction on Art. VI, § IV, ¶ I of the Georgia Constitution and O.C.G.A. §§ 9-4-2 and 15-6-8(1).

2

4.     Paragraph 4 contains conclusions of law to which no response is required.  To the extent a response is required, Defendant admits that Plaintiff asserts that the Court has personal jurisdiction over Acrisure Holdings pursuant to O.C.G.A. § 9-10-91.  Defendant denies the remaining allegations in Paragraph 4 as stated.

5.     As for Paragraph 5, Defendant states that the letter, which is dated March 26, 2021, speaks for itself.  Specifically, the letter states in part, "[t]he Company has elected to exercise its call Option as to all of [Hix's] 935,000 shares of the Company's Class C Preferred Stock" and that it "also serves as notice to [Hix] of the Company's retention of the total amount of the proceeds….as an offset of the amount" Plaintiff owed Defendant.  Defendant denies the remaining allegations in Paragraph 5.

6.     Defendant admits the allegation in Paragraph 6 that Acrisure Holdings' subsidiary, Acrisure, LLC, transacts business through "agency partners."  Defendant further admits that the entity operating as Acrisure, LLC d/b/a PentaRisk Insurance Services is an Acrisure agency partner ("PentaRisk Insurance Services").  Defendant also admits that PentaRisk Insurance Services has had an office in Atlanta, Georgia.  Defendant denies any remaining allegations in Paragraph 6 as stated.

7.     Paragraph 7 contains conclusions of law regarding venue to which no response is required.  To the extent a response is required, Defendant admits that

3

Plaintiff purports that venue is proper because of O.C.G.A. § 9-10-93 and purports that an injury occurred in Fulton, County, Georgia.

## Operative Facts

8.     Defendant admits the allegation in Paragraph 8 that it is in the insurance industry and that it is a growing insurance brokerage.   Defendant denies the remaining allegations in Paragraph 8 as stated.

9.     Defendant admits the allegation in Paragraph 9 that Plaintiff has been licensed by the State of Georgia as an insurance agent.  Defendant further admits that Plaintiff and the other owners sold the assets of PentaRisk Insurance Services, LLC ("OldCo")[1] to Acrisure, LLC in 2015.  Defendant also admits that the sale of the assets was pursuant to an asset purchase agreement.

10.     Defendant admit the allegation in Paragraph 10 that Plaintiff acquired shares in Acrisure Holdings as part of the asset purchase agreement.  Defendant further admits that Plaintiff sold some of the shares.  Defendant denies the remaining allegations in Paragraph 10 as stated.

---

[1] PentaRisk Insurance Services became a d/b/a of Acrisure, LLC on or about October 1, 2015.  For ease of reference, Defendant refers to the corporate entity that existed prior to October 1, 2015 as OldCo.  For allegations or events occurring after October 1, 2015, Defendant refers to the entity as "PentaRisk" or "the PentaRisk branch of Acrisure".

11.   As for Paragraph 11, Defendant states that the Fifth Amended and Restated Stockholders Agreement speaks for itself and denies that Plaintiff has accurately and/or completely summarized it.

12.   Defendant admits the allegation in Paragraph 12 of the Complaint that, in 2021, it exercised its right to purchase 935,000 shares from Plaintiff for the per-share price of $8.17.  Defendant further admits that the purchase price was $7,638,950. Defendant denies the remaining allegations contained in Paragraph 12.

13.   Defendant admits the allegation in Paragraph 13 that $8.17 represented "the per share fair market value of the shares."   Defendant denies the remaining allegations contained in Paragraph 13.

14.   Defendant admits the allegation in Paragraph 14 that it is not a "publicly traded company."   Defendant further admits that there generally is no publicly available information about the fair market value of its shares.  Defendant denies that the fair market value of the shares was greater than $8.17 at the time that Defendant exercised its Call Option.  Defendant denies the remaining allegations contained in Paragraph 14.

15.   As for Paragraph 15, Defendant states that the Fifth Amended and Restated Stockholders Agreement speaks for itself and denies that Plaintiff has accurately and/or completely summarized it.  Acrisure Holdings admits that it asserted its right

to exercise its Call Option as to Plaintiff's shares and that it retained the proceeds of such shares as an offset of some of the amount Plaintiff owed Defendant.

16.     As for Paragraph 16, Defendant states that the March 26, 2021 letter speaks for itself and denies that Hix has accurately and/or completely summarized it. Defendant denies the remaining allegations in Paragraph 16.

17.     Defendant admits the allegation in Paragraph 17 that the letter was sent to 450 Heards Ferry Road, NW, Sandy Springs, Georgia 30328.  Defendant also states that the letter was sent to 60 Cottage Street, Santa Rosa Beach, Florida 32459.

18.     As for Paragraph 18, Defendant states that the March 26, 2021 letter and exhibit thereto speak for themselves and denies that Plaintiff has accurately and/or completely summarized it.  Defendant denies all other allegations in Paragraph 18.

19.     Defendant denies the allegations contained in Paragraph 19.

20.     Defendant denies the allegations contained in Paragraph 20.

21.      As for Paragraph 21, Defendant states that the March 26, 2021 letter and exhibit thereto speak for themselves and denies that Plaintiff has accurately and/or completely summarized it.   Defendant admits that $6,841,692.50 represented a portion of the earn out overpayment paid to Plaintiff.

22.     Defendant admits the allegation in Paragraph 22 that the earn out payment is based upon provisions of the asset purchase agreement entered into by the parties in

6

2015.  Defendant further admits that Acrisure, LLC acquired the assets of OldCo pursuant to such asset purchase agreement.  Defendant denies the remaining allegations in Paragraph 22.

23.    As for Paragraph 23, Defendant states that the asset purchase agreement speaks for itself and denies that Plaintiff has accurately and/or completely summarized it.  Defendant admits that the earn out payment was based upon the financial performance of PentaRisk Insurance Services, as defined in the asset purchase agreement, in 2016 and 2017.

24.    Defendant denies the allegations contained in Paragraph 24.

25.    As for Paragraph 25, Defendant states that the May 14, 2021 letter speaks for itself and denies that Plaintiff has accurately and/or completely summarized it.

26.    As for Paragraph 26, Defendant states that the May 14, 2021 letter and exhibit thereto speaks for themselves and denies that Plaintiff has accurately and/or completely summarized them.  Defendant admits that Plaintiff misappropriated at least $634,741.00 in client checks, as further detailed in the Counterclaims brought by Defendant and Acrisure, LLC.

27.    Defendant denies the allegations contained in Paragraph 27.  As detailed in the Counterclaims brought by Defendant and Acrisure, LLC, Plaintiff

misappropriated client funds by depositing client checks into secret bank accounts under the control of Plaintiff for Plaintiff's personal use.

28.　　As for Paragraph 28, Defendant states that the May 14, 2021 letter and exhibit thereto speak for themselves and denies that Plaintiff has accurately and/or completely summarized them.　Defendant admits that Plaintiff owed at least $181,379.00 to Defendant for salaries paid to Plaintiff's pilots.

29.　　Defendant denies the allegations contained in Paragraph 29.

30.　　Defendant admits the allegation in Paragraph 30 that Plaintiff purportedly brings the present action in an attempt to obtain proceeds of his shares.　Defendant denies the remaining allegations in Paragraph 30.

## Count One - Declaratory Relief

31.　　 Defendant repeats and realleges each and every response to Paragraphs 1 to 30 with the same force and effect as if fully set forth herein.

32.　　The allegations contained in Paragraph 32 are not directed at Defendant and therefore require no response. To the extent a response is required, Defendant denies the allegations contained in Paragraph 32.

33.　　Defendant denies the allegations contained in Paragraph 33.

## Count Two - Civil Theft

34.     Defendant repeats and realleges each and every response to Paragraphs 1 to 33 with the same force and effect as if fully set forth herein.

35.     Defendant denies the allegations contained in Paragraph 35.

36.     Defendant denies the allegations contained in Paragraph 36.

37.     Defendant denies the allegations contained in Paragraph 37.

38.     Defendant denies the allegations contained in Paragraph 38.

## Count Three - Attorneys' Fees

39.     Defendant repeats and realleges each and every response to Paragraphs 1 to 38 with the same force and effect as if fully set forth herein.

40.     Defendant denies the allegations contained in Paragraph 40.

## Prayer for Relief

41.     Defendant denies that Plaintiff is entitled to the relief requested, including a judgment, costs, fees, or any other relief.

## GENERAL DENIALS

1.      Each and every allegation contained in the Complaint not specifically admitted herein is denied.

2.      To the extent that the defined terms contained in the Complaint constitute allegations, such allegations are denied.

3.     To the extent that the headings contained in the Complaint constitute allegations, such allegations are denied.

4.     The Complaint contains excerpts from and references to a number of documents.  Defendant denies any characterization of such documents in the Complaint and further denies that any limited quotations accurately state the contents of the full documents. Defendant respectfully refers the Court to the original source or document for a complete and accurate statement of all the terms thereof.

5.     Defendant expressly reserves its right to amend and/or supplement this Answer.

## AFFIRMATIVE DEFENSES

Defendant Acrisure Holdings asserts the following affirmative defenses with respect to the causes of action alleged in the Complaint, without assuming the burden of proof for any issue as to which applicable law places the burden on Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

All or part of the Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches, waiver, equitable estoppel, *in pari delicto*, unclean hands, bad faith, and/or other related equitable doctrines.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because any award to Plaintiff would constitute unjust enrichment.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of acquiescence.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the conduct challenged by Plaintiff was justified under the circumstances.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because of fraud committed by Plaintiff.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's prior breach.

### ADDITIONAL DEFENSES

Defendant Acrisure Holdings hereby reserves and asserts all affirmative defenses available under any applicable federal and/or state law. Defendant Acrisure Holdings further asserts, and expressly reserves all rights with respect to, all counterclaims, cross claims, third-party claims, indemnification or contribution claims, in addition to the counterclaims asserted herein, that may be revealed during the course of discovery.

## COUNTERCLAIMS FOR EQUITABLE RELIEF AND DAMAGES BY ACRISURE HOLDINGS, INC. AND ACRISURE, LLC

COMES NOW, Defendant and Counterclaim Plaintiff Acrisure Holdings, Inc. and Counterclaim Plaintiff Acrisure, LLC (collectively "Acrisure"), by and through counsel, and hereby files these Counterclaims for Damages and Equitable Relief against Plaintiff and Counterclaim Defendant William Parker Hix ("Hix"), showing the Court as follows:

### INTRODUCTION

This litigation arises from numerous breaches of fiduciary duty, breaches of contract, and fraudulent acts committed by Counterclaim Defendant Hix.

Hix committed his misconduct while serving as the manager of an insurance brokerage agency known as PentaRisk Insurance Services, which is a d/b/a of Acrisure, LLC ("PentaRisk"). Over the course of several years, while serving as the manager of PentaRisk, Hix manufactured false revenue, diverted insurance premium

payments from clients, and misused corporate assets for his own personal financial enrichment and to the detriment of Acrisure.

As an example of Hix's misconduct, Hix diverted at least $1.2M in client insurance premium payments due to carriers and client funds due to Acrisure for his own personal use. Instead of applying the funds as expected by clients and required by law, Hix surreptitiously took possession of client checks and deposited them in secret bank accounts that were unknown to, and beyond the control of, Acrisure. Hix opened and/or maintained the secret bank accounts in the PentaRisk name even though Hix had sold any rights to such name to Acrisure years earlier. By misusing the PentaRisk name on the bank accounts, Hix was able to funnel numerous checks written to "PentaRisk" (or derivations thereof) away from Acrisure and into his control. Thus, Hix committed fraud against Acrisure and also misused corporate assets, including but not limited to the client funds and the PentaRisk name, for his own financial enrichment. Among other things, Hix's conduct violated two valid contracts: a) his employment agreement with Acrisure, and b) the contract by which he sold the PentaRisk name and other corporate assets to Acrisure.

Acrisure terminated Hix's employment upon discovering Hix's fraudulent conduct. Acrisure further exercised its contractual right to retain Hix's shares of

Acrisure's Class C Preferred Stock as a partial offset of the financial obligations Hix owed to Acrisure for his fraudulent and wrongful acts.

Acrisure now defends itself against Hix's unsupported claims for relief and, through these Counterclaims, seeks to: a) recover compensatory damages for, among other things, the remaining funds Hix owes to Acrisure; b) obtain a permanent injunction against Hix to prevent his future misuse of Acrisure assets; and c) obtain other relief as appropriate, including but not limited to punitive damages and attorneys' fees.

## A.   PARTIES

1.     Counterclaim Plaintiff Acrisure Holdings, Inc. ("Acrisure Holdings") is a resident of and has its principal place of business in Grand Rapids, Michigan, and it is incorporated under the laws of Delaware.  It is the ultimate parent of Acrisure, LLC.

2.     Counterclaim Plaintiff Acrisure, LLC is a Michigan limited liability company. Its sole member is Acrisure Intermediate, Inc.  Acrisure Intermediate, Inc. is a Delaware corporation with its principal place of business in Michigan.  Acrisure, LLC is an indirect subsidiary of Acrisure Holdings, Inc.

3.     Acrisure Holdings, Inc. and Acrisure, LLC collectively are referred to herein as "Acrisure" or "the Company".

14

4.     Counterclaim Defendant William Parker Hix, upon information and belief, currently is a resident of Florida.  From October 1, 2015 through September 30, 2020, Hix was an employee of Acrisure, LLC.  In addition, from October 2015 through May 2021, Hix held shares of Acrisure Holdings, LLC.  Upon information and belief, at all times relevant to this litigation, Hix was authorized by the Georgia Department of Insurance to transact business as an insurance agent in Georgia and, thus, was subject to the legal requirements applicable to licensed insurance professionals.

## B.     JURISDICTION/VENUE

5.     The Court has personal jurisdiction over this dispute pursuant to: a) 28 U.S.C. § 1367, as the counterclaims are part of the same case or controversy as the claims brought by Counterclaim Defendant Hix against Acrisure, and b) 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

6.     Venue is proper in this Court as Hix has availed itself of the jurisdiction of this District.

## C.     STATEMENT OF FACTS

### 1.     __Acrisure and its Agency Partners__

7.     Acrisure is a brokerage of property & casualty, benefits, and related insurance coverages and services.  Acrisure has been built through the acquisition of insurance brokerages across the United States and in select global markets.  When Acrisure acquires an insurance brokerage, it becomes an Acrisure Agency Partner.  Acrisure selects Agency Partners that have expertise and trusted management and then draws on such management to continue providing superior business solutions for clients.

8.     Acrisure Holdings has various classes of capital stock authorized and outstanding.  Outstanding shares of Acrisure Holdings' capital stock are held by entities and persons that have joined Acrisure Holdings' stockholders agreement, many of whom are employees of Acrisure Holdings or its subsidiaries.  Such shares are not traded on a public exchange.  The value of Acrisure Holdings' common equity is determined by its board of directors utilizing recognized valuation methods.

    **2.**    **In 2015, Acrisure Purchased the Assets of PentaRisk Insurance Services, LLC from Counterclaim Defendant Hix and PentaRisk Became an Acrisure Agency Partner**

9.     In or around 2012, Hix and three others individuals formed PentaRisk Insurance Services, LLC (along with PentaRisk Holdings, LLC and PentaRisk Associates of Georgia, LLC, collectively referred to herein as "OldCo")[2] with a

_____

[2] As referenced herein, PentaRisk Insurance Services became a d/b/a of Acrisure on or about October 1, 2015.  For ease of reference, the Counterclaims refer to the corporate entity that existed prior to October 1, 2015 as OldCo.  For allegations or

primary office in Atlanta, Georgia.  OldCo was an insurance brokerage that offered commercial lines of insurance to its clients.

10.     Until September 30, 2015, Hix served as the Chief Executive Officer of OldCo and was its majority owner.  Upon information and belief, Hix owned approximately 85% of OldCo.

11.     Effective October 1, 2015, Hix and his co-owners sold the assets of OldCo to Acrisure, LLC pursuant to an Asset Purchase Agreement, as amended by the First Amendment to the Asset Purchase Agreement (collectively, "APA").  The APA is a valid and binding contract.

12.     Since October 1, 2015, Acrisure has operated PentaRisk as an Agency Partner and all individuals who work there are working for Acrisure.

13.     On or about October 1, 2015, as contemplated by the APA, Hix entered into an Employment Agreement with Acrisure, LLC (the "Employment Agreement"). The Employment Agreement is a valid and binding contract.

14.     Beginning on or about October 1, 2015, Hix served as the manager of the PentaRisk branch of Acrisure.  He continued in that role until Acrisure terminated his employment on September 30, 2020.

---

events occurring after October 1, 2015, the Counterclaims refer to the entity as "PentaRisk" or "the PentaRisk branch of Acrisure".

15.   The Employment Agreement described Hix's duties, which included but were not limited to the general management of the PentaRisk office and selling insurance policies and related products to clients.

16.   The PentaRisk branch of Acrisure had some of its own accounting staff and handled many of its own accounting functions, including invoicing clients and processing client payments.  It also interfaced directly with its clients and, in many instances, engaged in contract negotiations with its clients for consulting and other fees.   As manager, Hix was responsible for the oversight of all accounting, contracting, insurance brokerage, and other matters handled by staff working within the PentaRisk branch of Acrisure.

### 3.   Acrisure Purchased the Business, Assets, and Goodwill of OldCo, including the Name "PentaRisk", as Part of the Asset Purchase Agreement Signed by Hix

17.   Pursuant to Section 1.1 of the APA, Acrisure acquired "all of the business, assets, and goodwill owned," except for specified excluded assets, of OldCo.   This purchase included, but was not limited to, OldCo's "Proprietary Rights," defined as, among other things, all "trademarks, service marks, trade dress, trade names, and corporate names and registrations, renewals and applications for registration thereof . . . ."

18.   Pursuant to Section 1.1(i) of the APA, Hix relinquished all right to use the name PentaRisk or any derivations thereof because Acrisure acquired "all rights to the names 'PentaRisk Holdings,' 'PentaRisk Associates,' 'PentaRisk Insurance Services' and derivatives thereof and all goodwill and going concern value associated with" OldCo.

19.   As outlined in Section 2.1 of the APA, Acrisure purchased the assets of OldCo for several million dollars.  The funds were distributed in both cash and shares of Acrisure Holdings.   Upon information and belief, Hix received the largest distribution of the payment.

20.   As of December 31, 2015, the parties engaged in an accounting "true up" of the transaction.  The "true up" resulted in Acrisure making an additional multi-million dollar payment to the OldCo owners.  Once again, upon information and belief, Hix received the largest portion of the payment.

      **4.**    **The Asset Purchase Agreement Provided for Contingent Payments Based Upon Future Revenue**

21.    Section 2.6 of the APA provided that the OldCo owners, including Hix, could earn three types of contingent payments during the two years following the transaction.[3]

22.    For the first year of contingent payments, Section 2.6 of the APA specified that the payment threshold was based on the OldCo EBITDA as of the Adjustment Date, as identified in the APA.  For the second year of contingent payments, the APA specified that the payment threshold was based upon the first year's Adjusted EBITDA.

23.    Exhibit A of the APA defined EBITDA as, "earnings, determined in accordance with GAAP, before interest, income taxes, depreciation and amortization."  Exhibit A also provided a detailed definition of Adjusted EBITDA.

24.    According to Exhibit A of the APA, the Adjustment Date for OldCo's EBITDA was December 31, 2015.  Thus, the contingent payment period for the first year was January 1, 2016 - December 31, 2016 ("Year One").   The contingent payment period for the second year was January 1, 2017 - December 31, 2017 ("Year Two").

(a)    **Year One Contingent Payments**

---

[3] The APA is a confidential document that contains proprietary, commercially sensitive information and trade secrets.  Thus, Acrisure does not quote those provisions herein and has not attached it to this document.

25.    In Year One, based upon Hix's representations of PentaRisk's revenue and Adjusted EBITDA, Hix and his former co-owners seemingly qualified for all three contingent payments specified in the APA.

26.    Pursuant to Section 2.6(a)(i) of the APA, Hix and his former co-owners were to be paid the first contingent payment if PentaRisk's Adjusted EBITDA was above a certain percentage of OldCo's Adjustment Date EBITDA.  The APA specified that the first contingent payment would be a multiple of the amount exceeding the percentage threshold.  More specifically, Hix and his former co-owners would be paid a multiple for each dollar above the threshold.

27.    Based upon Hix's representations, PentaRisk's Year One Adjusted EBITDA exceeded the Year One threshold for the first contingent payment.  Thus, based upon Hix's representations, Acrisure paid a multiple of the amount above that threshold to Hix and his former co-owners.  Specifically, Acrisure paid more than $3M, which payment was comprised of both cash and Acrisure Holdings shares, to Hix and his former co-owners for the first contingent payment.

28.    Pursuant to Section 2.6(a)(ii) of the APA, Hix and his former co-owners also were entitled to a second contingent payment if PentaRisk's Adjusted EBITDA exceeded OldCo's Adjustment Date EBITDA by a greater amount than that required for the first contingent payment.  The amount to be paid was specified in the APA.

21

29.     Based upon representations by Hix, PentaRisk's Year One Adjusted EBITDA exceeded the threshold for the second contingent payment.  Thus, based upon Hix's representations, Acrisure paid the second contingent payment to Hix and his former co-owners.   Specifically, Acrisure paid more than $2M, which payment was comprised of both cash and Acrisure Holdings shares, to Hix and his former co-owners as a Year One second contingent payment.

30.     Pursuant to Section 2.6(a)(iii) of the APA, Hix and his former co-owners were entitled to a third contingent payment if PentaRisk's Adjusted EBITDA exceed OldCo's Adjustment Date EBITDA by an even greater amount than that for the first and second contingent payments.  The amount to be paid was specified in the APA.

31.     Based upon representations by Hix, PentaRisk's Year One Adjusted EBITDA exceeded the third contingent payment threshold.   Thus, based upon Hix's representations, Acrisure paid a third contingent payment to Hix and his former co-owners.  Specifically, Acrisure paid more than $1M, which payment was comprised of both cash and Acrisure Holdings shares, to Hix and his former co-owners as a third contingent payment.

32.     In total for Year One, Acrisure paid more than $6M in contingent payments to Hix and his former co-owners.  Upon information and belief, Hix took nearly all of the Year One contingent payments for himself.

### (b)   Year Two Contingent Payments

33.    In Year Two, based upon Hix's representations of PentaRisk's revenue and Adjusted EBITDA, Hix and his former co-owners seemingly qualified for at least one of the contingent payments specified in the APA.

34.    Pursuant to Section 2.6(a)(i) of the APA, Hix and his former owners were entitled to a contingent payment if PentaRisk's Year Two Adjusted EBITDA exceeded a certain percentage of PentaRisk's Year One Adjusted EBITDA.  Similar to Year One, the first contingent payment for Year Two would be a multiple of the amount exceeding the contingent payment threshold.

35.    Based upon Hix's representations, PentaRisk's Year Two Adjusted EBITDA exceeded the first contingent payment threshold.   Thus, based upon Hix's representations, Acrisure paid a multiple of the amount above the percentage threshold to Hix and his former co-owners.  Specifically, Acrisure paid more than $4M, which payment was comprised of both cash and Acrisure Holdings shares, to Hix and his former co-owners as a Year Two contingent payment.  Upon information and belief, Hix took nearly all of the Year Two contingent payment for himself.

### 5.    Hix's Fraudulent Conduct in Support of Year One and Year Two Contingent Payments

36.    For the Year One contingent payments, Hix included $265,000 of income in the Adjusted EBITDA for PentaRisk based upon one client, which was a concrete

company located in Georgia ("Client A").  The revenue attributable to Client A had a significant impact on the Year One contingent payment amount.  As an example, because the first contingent payment was a multiple of the revenue over a certain threshold, the $265,000.00 of revenue attributed to Client A contributed significantly to the more than $3M first contingent payment in Year One.

37.    For Year Two, Hix included the following in the Adjusted EBITDA for PentaRisk: a) $500,000.00 of income from a client in the investment services industry ("Client B"), and b) $100,000.00 of income from a client in the employment services industry ("Client C").  The revenue attributable to Client B and Client C had a significant impact on the more than $4M Year Two contingent payment because the income was multiplied as part of the contingent payment structure outlined in the APA.

38.    Based upon Hix's intentional and fraudulent misrepresentations about revenue related to all three clients, as outlined below, Hix received contingent payments to which he was not entitled, which violated the APA.  He further breached his fiduciary duties to Acrisure and his contractual obligations under his Employment Agreement by asserting and claiming the revenue for such clients, which he knew would never be collected.

(a)    **Hix's Assertion of Fraudulent Revenue for Client A**

24

39.    For contingent payment calculations, PentaRisk recognized revenue as of the effective date of some contracts.  Thus, PentaRisk included revenue in the Adjusted EBITDA for Year One or Year Two contingent payments based upon when a contract was agreed to and not when the work pursuant to the contract was completed or when the client made a payment on the contract.

40.    On or about January 25, 2017, Client A signed a Consulting Agreement in the amount of $144,000.00 for services to be performed in 2017 ("First Contract").  The First Contract was effective December 15, 2016.  It stated that PentaRisk would provide the following services during calendar year 2017: "Risk Management, Safety Training, Safety Surveys, Worksite Loss Control Inspections and Loss Control Reports."  During 2017, Client A fulfilled the payment terms of the contract and Client A's payments were deposited into Acrisure-controlled bank accounts.

41.    On or about February 10, 2017, Client A purportedly signed a Consulting Agreement in the amount of $265,000.00 for additional services to be performed in 2017 ("Second Contract").  The Second Contract provided that PentaRisk would perform the following services during calendar year 2017: "Review and Reporting of all claims to affected Company Insurers and processing and administration of all small property claims including all windshield claims."

42.    Although the Second Contract was signed on February 10, 2017, the start date of the Second Contract was December 30, 2016, which was one day before the close of the Year One Contingent Payment period.

43.    The Second Contract was fraudulent.  There is no indication that Client A actually signed the contract.  Moreover, although Client A made payments on the First Contract during 2017, the client did not make any payments toward the Second Contract in 2017.

44.    In early 2018, PentaRisk suddenly produced a payment for Client A on the Second Contract.  However, the payment did not come from Client A.  Instead, on or about January 31, 2018, Acrisure received a check from OldCo for the Second Contract amount.  The OldCo check was signed by Hix.

45.    Hix represented to Acrisure that the OldCo check was forwarding funds that Client A had paid on the Second Contract to a non-Acrisure controlled account. There is no support for Hix's representation that Client A made the payment that Hix purportedly forwarded Acrisure.

46.    From the outset, Hix knew that the revenue that PentaRisk recognized for the Second Contract would not be paid by the client.  Hix fraudulently misrepresented the revenue of the Second Contract to obtain the Year One contingent payments paid to him by Acrisure.

**(b)     Hix's Assertion of Fraudulent Revenue for Client B**

47.     Upon information and belief, Client B is a personal friend of Hix.

48.     On or about December 15, 2017, Client B purportedly executed a Service Fee Agreement in the amount of $500,000.00.  Although this was mere days before the close of the Year Two contingent payment period, the revenue was included in Adjusted EBITDA for Year Two.

49.     The contract stated that PentaRisk would provide the following services during calendar year 2017:

> safety policy review, loss control recommendations, exposure assessment, driving record analysis, risk management consulting, insurance claim consulting, contractual insurance requirement analysis and negotiation assistance, loss history analysis, experience modification analysis.

50.     Client B's contract stated that the $500,000.00 was "100% fully earned and non-refundable as of the inception date of the agreement."  It further provides the "fee is due" by March 31, 2018.

51.     As of April 2018, Client B had not made the required $500,000.00 payment pursuant to the contract.  That month, as Acrisure reviewed the support for the Year Two contingent payment, Acrisure noted the lack of payment and that Client B's signature block on the contract misspelled the client's name.

52.    Thus, on or about May 7, 2018, an Acrisure executive sent an email message to Client B to inquire about the validity of the contract.  In the email message, Acrisure asked Client B: a) whether the client authorized the contract to be signed, b) whether the contract remained in effect, and c) whether the client intended to pay the outstanding balance within 30 days.  Hix was copied on the email message.

53.    Shortly thereafter, Hix sent a separate email message to Client B, which forwarded the contract and stated, "I'll call you tomorrow to discuss. Talk soon". Hix did not copy the Acrisure executive on his email message to Client B.

54.    On May 30, 2018, after not receiving any response from Client B, the Acrisure executive sent a follow-up email message to Client B.  The email message again copied Hix.  Shortly thereafter, Hix again sent an email message only to Client B, stating, "I'll call you shortly."

55.    On June 7, 2018, Client B informed Acrisure that its payment was dependent on future actions to be taken by PentaRisk.  This statement directly contradicted the written terms of the one-page contract.

56.    The contract expired on November 30, 2018 without Client B making any payments to Acrisure on it.  In fact, Client B never made any payments on the contract.

57.    The $500,000.00 of revenue was not received by Acrisure, even though Hix included the revenue in the Year Two Adjusted EBITDA for PentaRisk.  Without the revenue from Client B, Hix would have earned less in contingent payments for Year Two.

58.    From the outset, Hix knew that the revenue that PentaRisk recognized for the Client B contract would not be paid by the client.  Hix fraudulently misrepresented the revenue of the Client B contract to obtain the Year Two contingent payment from Acrisure.

### (c)    Hix's Assertion of Fraudulent Revenue for Client C

59.    Upon information and belief, Client C is a personal friend of Hix.

60.    On or about December 27, 2017, Client C purportedly executed a Service Fee Agreement in the amount of $100,000.00.  Although this was mere days before the close of the Year Two contingent payment period, the revenue related to the Service Fee Agreement was included in the Year Two Adjusted EBITDA.

61.    Although the one-page contract stated that payment was due in full by March 31, 2018, Client C did not make any payments by that date.

62.    In or around April 2018, as Acrisure was reviewing the support for the Year Two contingent payment, Acrisure noted that Client C's signature block on the contract misspelled Client C's name.

63.    On or about May 7, 2018, an Acrisure executive sent an email message to Client C to inquire about the validity of the contract.  In the email message, Acrisure asked Client C: a) whether the client authorized the contract to be signed, b) whether the contract remained in effect, and c) whether the client intended to pay the outstanding balance within 30 days.  Hix was copied on the email message.

64.    On May 23, 2018, Hix forwarded the email message to Client C, stating, "Here you go.  I'll call you shortly".  Hix did not include the Acrisure executive on his email message to Client C.

65.    Shortly thereafter, Client C wrote Hix, "Thanks but we need to discuss this, we do not owe the $100K and do not want to authorize that we do absent another agreement saying its [*sic*] taken care of."

66.    On May 30, 2018, having not received a response from Client C, the Acrisure executive sent a follow-up email message to Client C.  The email message again copied Hix.  Shortly thereafter, Client C informed Acrisure it was reviewing the contract "for the first time" and intended to audit the account internally.

67.    On June 14, 2018, in an email message, Client C informed Acrisure that it was "current on all obligations owed to PentaRisk" and that the $100,000.00 was not outstanding.

68.    The agreement expired without Client C making any payments to Acrisure on the contract.  Thus, the $100,000.00 was not revenue received by Acrisure, even though Hix included the revenue in the Year Two Adjusted EBITDA for PentaRisk. Without the revenue from Client C, Hix would have earned less in contingent payment for Year Two.

69.    From the outset, Hix knew that the revenue that PentaRisk recognized for the Client C contract would not be paid by the client.  Hix fraudulently misrepresented the revenue of the Client C contract to obtain the Year Two contingent payment from Acrisure.

### 6.    Hix Diverted at Least $1.2M in Client Funds for his Own Financial Enrichment at the Expense of Acrisure

70.    In August 2020, Acrisure discovered that Hix had been surreptitiously taking possession of client checks and deposited them in secret bank accounts that were unknown to, and beyond the control of, Acrisure.  Such checks were insurance premium payments due to carriers as well as other client funds due to Acrisure.

71.    Acrisure subsequently discovered that Hix used several bank accounts in the name of PentaRisk Holdings or other PentaRisk-named entities as a means of committing the fraud, which are referred to herein as the "Secret Bank Accounts." Such accounts are located at least three different financial institutions with branch locations in or around Atlanta, Georgia.  Hix did not have Acrisure's authorization

to use the Secret Bank Accounts in connection with Acrisure business, including but not limited to the handling of client funds.

72.    Hix was able to deposit client checks made out to PentaRisk or related entities because the Secret Bank Accounts included the name PentaRisk in the account name.  Among other things, Hix's misuse of the PentaRisk name to divert client funds violated the APA as well as the Employment Agreement.

73.    Hix has diverted at least $1.2M of client funds for his own financial enrichment, as outlined below:

   a. In   December   2018,   PentaRisk   issued   multiple   invoices   totaling $623,700.00 to a client located in Deland, Florida for payment of insurance premium owed to a carrier and fees owed to Acrisure.  That same month, the client issued multiple checks to PentaRisk for the total amount due of $623,700.00.  On or about March 5, 2019, Hix signed a check in the amount $550,168.75 drawn a Secret Bank Account for payment to the insurance carrier.  Upon information and belief, Hix kept the remaining funds for his own financial enrichment.

   b. On or about April 23, 2020, PentaRisk issued an invoice in the amount of $14,543.00 to a client located in Atlanta, Georgia for the premium due to a carrier.  On or about June 11, 2020, the client issued a check to PentaRisk

for $14,543.00.  In or around August 2020, a photocopy of the check was located in Hix's PentaRisk office; however, the check was never deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $14,543.00 for his own financial enrichment.

c. On or about April 20, 2020, PentaRisk issued invoices in the total amount of $8,709.00 to a client in Smyrna, Georgia for the premium due to a carrier.  On or about July 22, 2020, the client issued a check to PentaRisk for $8,709.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office; however, the check has not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $8,709.00 for his own financial enrichment.

d. On or about April 29, 2020, PentaRisk issued an invoice in the amount of $20,317.00 to a client located in Eastanollee, Georgia for payment of due to a carrier.  On or about May 5, 2020, the client issued a check to PentaRisk for $20,317.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office; however, the check has not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $20,317.00 for his own financial enrichment.

e.  On or about May 27, 2020, PentaRisk issued an invoice in the amount of $4,940.00 to Client C, as identified above in Paragraph 59, for payment of premium due to a carrier.  On or about June 2, 2020, Client C issued a check to PentaRisk for $4,940.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office.  Client C subsequently provided a copy of the check to Acrisure, which shows that it was deposited into a Secret Bank Account.  Upon information and belief, Hix kept the $4,940.00 for his own financial enrichment.

f.  On or about May 27, 2020, PentaRisk issued invoices for a total amount of $141,302.00, to a client located in Illinois for insurance premium due to carriers and a fee owed to Acrisure.  On or about June 1, 2020, the client issued a check to PentaRisk for $141,302.00.  The check was not deposited into an Acrisure-controlled bank account.  On or about September 13, 2021, Hix used a non-Acrisure issued credit card to pay $20,439.37 of the client's insurance premium to the insurance broker.  Acrisure subsequently obtained an endorsed copy of the client's check, which had been deposited into a Secret Bank Account on June 10, 2020.  Upon information and belief, Hix kept at least a portion of the remaining $120,862.63 for his own financial enrichment.

34

g.  On or about June 24 and July 6, 2020, PentaRisk issued invoices for the total amount of $4,538.00 to a client in Valdosta, Georgia for premium due to a carrier.  On or about July 8, 2020, the client issued a check to PentaRisk for $4,538.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office.  The check has not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $4,538.00 for his own financial enrichment.

h.  On or about June 25 and July 13, 2020, PentaRisk issued invoices in the total amount of $142,387.00 to a client in Vidalia, Georgia.  The invoices related to payments due to carriers.  On or about July 24, 2020, the client issued a check to PentaRisk for $142,387.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office.  The check has not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $142,387.00 for his own financial enrichment.

i.  On or about June 29, 2020, PentaRisk issued invoices to a client located in Alpharetta, Georgia in the total amount of $86,294.60 for insurance premium due to carriers.  On or about July 13, 2020, the client issued checks to PentaRisk for a total of $86,294.60.  In or around August 2020, check stubs for both checks were located in Hix's PentaRisk office.  The

35

checks have not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $86,294.60 for his own financial enrichment.

j.  In or around May 29 and July 21, 2020, PentaRisk issued invoices in the totaling $27,412.00 to a client located in Albany, Georgia for insurance premium due to carriers.  On July 16 and 22, 2020, the client issued checks to PentaRisk for the total amount of $27,412.00.  In or around August 2020, a copy of the checks were located in Hix's PentaRisk office.  Neither check has been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $27,412.00 for his own financial enrichment.

k.  On or about August 14, 2020, PentaRisk issued an invoice in the amount of $7,948.00 to a client in Martinez, Georgia for premium due to a carrier. On or about August 17, 2020, the client issued a check to PentaRisk for $7,948.00.  In or around August 2020, a copy of the check was located in Hix's PentaRisk office.  The check has not been deposited in an Acrisure-controlled account.  Upon information and belief, Hix kept the $7,948.00 for his own financial enrichment.

l. On or about August 19, 2020, PentaRisk issued an invoice in the amount of $149,760.00 to a client located in Birmingham, Alabama for premiums due to carriers. On or about August 24, 2020, an agent of the client issued a check to PentaRisk in the amount of $149,760.00. In August 2020, a copy of the check was located in Hix's PentaRisk office. The check has not been deposited in an Acrisure-controlled account. Acrisure subsequently obtained a copy of the check, which shows that it was deposited into a Secret Bank Account. Upon information and belief, Hix kept the $149,760.00 for his own financial enrichment.

74. Upon information and belief, Hix took possession of additional client funds for his own financial enrichment.

75. Acrisure made payments to carriers and brokers on behalf of PentaRisk clients as a result of Hix's misconduct.

### 7. Hix's Diversion of Additional Acrisure Assets for His Own Personal Use

76. In addition to diverting client funds and misusing the PentaRisk name, Hix misused other Acrisure assets for his own benefit.

77. For example, by August 2020, Hix employed two individuals as pilots for his personal jet that he maintained in or around Atlanta, Georgia. Hix included the pilots on the Acrisure payroll as PentaRisk employees. Hix had one pilot identified in

Acrisure's records as a Claims Executive and the other as a Claims Specialist. However, neither pilot performed any work related to claims activities.  Indeed, the pilots did not perform any work for Acrisure at all.   As a result of Hix's misrepresentation that the pilots were claims employees, Acrisure provided at least $180,000 in compensation to the pilots.

78.    Hix also has directly and/or indirectly facilitated the movement of clients away from Acrisure, in violation of his Employment Agreement.

### 8.    Hix's Termination and Acrisure Holding's Exercise of its Call Option

79.    Section 9 of the Employment Agreement defined when Hix could be terminated for Good Cause, which including but was not limited to: a) when Hix engaged in "fraud, dishonesty, or other gross negligence or will full misconduct…, including misappropriation of" Acrisure's property; and b)  when Hix engaged in "conduct that results in demonstrable damage to the business or reputation of" Acrisure.

80.    Section 16.a of the Employment Agreement provided it operated for the benefit of Acrisure, LLC's affiliates such as Acrisure Holdings.

81.    On September 30, 2020, after uncovering the misconduct discussed above, Acrisure, LLC terminated Hix for Good Cause.

82.    At the time of his termination, Hix held approximately 935,000 shares of Acrisure Holdings.  Hix's right to the shares was governed by the Fifth Amended and Restated Stockholders Agreement ("Stockholders Agreement").

83.    Section 5.1 of the Stockholders Agreement contained a Call Options provision.  Among other things, that provision provided that Acrisure Holdings had the right to purchase the shares upon the termination of a shareholder's employment with Acrisure.  This included but was not limited to instances in which the termination as for cause.

84.    Acrisure determined that Hix's conduct created no less than a $7.6M liability to Acrisure.  This liability included amounts related to fraudulent revenue used as a basis for the contingent payments, misappropriated client funds, and misuse of Acrisure assets.

85.    Thus, on or about March 26, 2021, and pursuant to Section 5 of the Stockholders Agreement, Acrisure Holdings elected to exercise its Call Option as to the approximately 935,000 shares held by Hix.

86.    The value of those shares at the time, as calculated by Acrisure on a monthly basis, was $8.17 per share.  Thus, the value of the shares was more than $7.6M.

87.     Exercising the Call Option created a liability to Hix.  Pursuant to Stockholders Agreement Section 5.3.3, Acrisure Holdings reduced Hix's outstanding liability to Acrisure by the value of his shares.

88.     Hix's liability to Acrisure in excess of the amount offset by Acrisure Holdings remains unpaid, despite Acrisure's March 26, 2021 letter setting forth the amounts Hix owed to Acrisure in excess of the amount offset.

### D.     CLAIMS FOR DAMAGES AND EQUITABLE RELIEF

### COUNT I: Breach of Fiduciary Duty
### (Acrisure Holdings and Acrisure, LLC against Hix)

89.     Paragraphs 1 through 88 are incorporated by reference as though fully set forth herein

90.     From October 1, 2015 through September 30, 2020, Hix was an employee of Acrisure, LLC.

91.     Hix owed fiduciary duties to Acrisure including but not limited to the duties of good faith and fair dealing.

92.     As set forth herein, Hix breached his fiduciary duties to Acrisure.

93.     As a proximate cause of Hix's breaches of his fiduciary duties, Acrisure sustained damages, including but not limited the loss of revenue from Acrisure clients, losses resulting from Hix's misuse of Acrisure assets, and the incurrence of fees and expenses it otherwise would not have incurred.

94.    Acrisure prays for relief from Hix as determined at trial, including compensatory damages, interest, and any such other relief as the Court may deem proper.

### COUNT II: Breach of Contract (Asset Purchase Agreement)
### (Acrisure, LLC against Hix)

95.    Paragraphs 1 through 94 are incorporated by reference as though fully set forth herein.

96.    Acrisure, LLC and Hix entered into a valid and binding Asset Purchase Agreement that sets forth the duties and obligations of each party.

97.    Hix breached his duties to Acrisure, LLC in several ways, including but not limited to asserting fraudulent revenue in support of contingent payments and misusing the assets he sold to Acrisure, including the PentaRisk name, for his own personal use and financial enrichment.

98.    The APA further provides for an award of attorneys' fees for the prevailing party.

99.    These breaches caused damages to Acrisure, LLC as set forth above.

100.   Acrisure, LLC prays for such relief as may be appropriate for Hix's breach of contract, including compensatory damages, interest, attorney fees provided under the contract and any such other relief as the Court may deem proper.

### COUNT III: Breach of Contract (Employment Agreement)

41

**(Acrisure, LLC against Hix)**

101.   Paragraphs 1 through 100 are incorporated by reference as though fully set forth herein.

102.   Acrisure, LLC and Hix entered into a valid and binding Employment Agreement that set forth the duties and obligations of each party.

103.   Hix breached the contract in the manner set forth herein, including but not limited to asserting fraudulent revenue, taking client funds for his own financial enrichment, and misusing corporate assets for his own personal benefit, including but not limited to directly and/or indirectly facilitating or causing the movement of clients away from Acrisure, in violation of the covenants in his Employment Agreement.

104.   These breaches caused damages to Acrisure, LLC as set forth above.

105.   Acrisure, LLC prays for such relief as may be determined at trial, including compensatory damages, interest, and any such other relief as the Court may deem proper.

**COUNT IV: Fraudulent Misrepresentation/Omissions**
**(Acrisure Holdings and Acrisure LLC against Hix)**

106.   Paragraphs 1 through 105 are incorporated by reference as though fully set forth herein.

107.   Beginning no later than 2016 and continuing through September 30, 2020, Hix knowingly made numerous material misrepresentations to, and concealed material facts from, Acrisure, including but not limited to representations or omissions regarding PentaRisk revenue, the receipt of client funds, and the use of corporate assets.  The omissions were of a nature that Hix reasonably would have known that the information should have been disclosed to Acrisure.

108.   Hix so acted with the intent to deceive Acrisure and with the intent for Acrisure to rely on his misrepresentations and omissions.

109.   Acrisure relied on such material misrepresentations and omissions.

110.   As a result of its justifiable and necessary reliance on information that Hix held out as complete and truthful, but which Hix knew to be incomplete, misleading, and false, Acrisure incurred damages.

111.   Acrisure Holdings and Acrisure, LLC pray for such relief as may be determined at trial, including compensatory damages, interest, and any such other relief as the Court may deem proper.

## COUNT V: Unjust Enrichment
### (Acrisure Holdings and Acrisure LLC against Hix)

112.   Paragraphs 1 through 111 are incorporated by reference as though fully set forth herein.

113.   Through the conduct outlined herein, Hix has been unjustly enriched at the expense of and detriment to Acrisure.

114.   Acrisure is entitled to damages, in an amount to be determined at trial, under the doctrine of unjust enrichment from Hix.

## COUNT VI: Civil Theft
### (Acrisure Holdings and Acrisure LLC against Hix)

115.   Paragraphs 1 through 114 are incorporated by reference as though fully set forth herein.

116.   Hix committed theft, as defined in Article 1, Chapter 8 or Title 16 of the Georgia Code, of property to which Acrisure has title under the APA and other agreements by engaging in the conduct set forth above, including but not limited to asserting fraudulent revenue, taking client funds for his own financial enrichment, and misusing corporate assets for his own personal benefit.

117.   Acrisure is entitled to damages pursuant to O.C.G.A. § 51-10-6(a), in an amount to be determined at trial, for Hix's illegal theft.

## COUNT VII: Permanent Injunctive Relief
### (Acrisure Holdings and Acrisure LLC against Hix)

118.   Paragraphs 1 through 117 are incorporated by reference as though fully set forth herein.

119.   Pursuant to the Asset Purchase Agreement, Acrisure acquired the exclusive right to use the name PentaRisk, and any derivative thereof, as well as other assets.

120.   Hix has continued to use the name PentaRisk for his own purposes and to the detriment of Acrisure.

121.   Hix's continued or further use of the name PentaRisk and other Acrisure assets would irreparably harm Acrisure.

122.   Acrisure has no adequate remedy at law to prevent Hix's continued use of the name PentaRisk and other Acrisure assets.

123.   Thus, Acrisure is entitled to a permanent injunction prohibiting Hix from using the PentaRisk name, or any derivative thereof, and other Acrisure assets in the future.

## COUNT VIII: Punitive Damages
### (Acrisure Holdings and Acrisure, LLC against Hix)

124.   Paragraphs 1 through 123 are incorporated by reference as though fully set forth herein.

125.   Hix's acts, practices, and omissions described herein constitute clear and convincing evidence of his willful misconduct, malice, fraud, wantonness, oppression, or entire want of care, and raise the presumption of his conscious indifference to consequences.

126.   Hix's conduct described herein evidences his specific intent to harm Acrisure.

45

127.   Hix is liable to Acrisure for punitive damages in an amount to be determined at trial.

### COUNT IX: Attorneys' Fees
### (Acrisure LLC and Acrisure Holdings against Hix)

128.   Paragraphs 1 through 127 are incorporated by reference as though fully set forth herein.

129.   Acrisure is entitled to its costs and attorneys' fees pursuant to O.C.G.A. § 13-6-11 as well as provisions of the APA and Employment Agreement.

130.   By falsifying revenue, misappropriating client funds, and misusing Acrisure assets for his own personal gain and financial enrichment, Hix owed a debt to Acrisure and has acted in bad faith and caused Hix unnecessary trouble and expense.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Counterclaim Plaintiffs Acrisure Holdings and Acrisure pray and demand as follows:

1.   That judgment be entered for the Counterclaim Plaintiffs on each and all of their claims;

2.   An award of compensatory damages to be proven at trial, punitive and exemplary damages, reasonable costs and fees, including attorney's fees, and interest; and

3.     Injunctive relief be imposed to prevent Counterclaim Defendant Hix from continued use of Acrisure assets;

4.     All other additional relief as justice may require or as the Court may deem appropriate.

## <u>DEMAND FOR A JURY TRIAL</u>

Under Rule 38 of the Federal Rules of Civil Procedure, Acrisure Holdings and Acrisure LLC request a trial by jury for any issues so triable by right.

This 10th day of November, 2021.

/s/ *Jeffrey A. Zachman*
Georgia Bar No. 254916
jeffrey.zachman@dentons.com
Uchenna Ekuma-Nkama
Georgia Bar No. 957861
uchenna.ekuma-nkama@dentons.com

DENTONS US LLP
303 Peachtree Street, N.E.
Suite 5300
Atlanta, Georgia  30308
(404) 527-4000


Lisa Krigsten (*pro hac forthcoming*)
Lisa.krigsten@dentons.com

*Attorneys for Acrisure Holdings, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2021, I caused to be served a true

and correct copy of the foregoing to the following attorneys of record via ECF

electronic notifications, email, and U.S. mail:

Robert L. Ashe III
ashe@bmelaw.com
Jennifer L. Peterson
peterson@bmelaw.com
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309

*/s/ Jeffrey A. Zachman*